AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

LODGED
CLERK, U.S. DISTRICT COURT
**9/18/2020**
CENTRAL DISTRICT OF CALIFORNIA
BY: ____ JP ____ DEPUTY

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
September 18, 2020
CENTRAL DISTRICT OF CALIFORNIA
BY: **VM** DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>ANDRES BERMUDEZ,<br><br>Defendant | Case No.   2:20MJ4486-Duty |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 28, 2020, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Christopher Siliciano, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   September 18, 2020

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Michael R. Wilner, U.S. Magistrate Judge
*Printed name and title*

AUSAs:     Puneet V. Kakkar (213-894-5728)
           Keith D. Ellison (213-894-6920)

## AFFIDAVIT

I.    PURPOSE OF AFFIDAVIT..................................2

II.   BACKGROUND OF AFFIANT.................................3

III.  SUMMARY OF PROBABLE CAUSE............................4

IV.   BACKGROUND ON DARKNET DRUG TRAFFICKING...............5

V.    STATEMENT OF PROBABLE CAUSE..........................7

      A.   Background of Investigation.....................7

      B.   February 11, 2020, Drug Seizures................8

      C.   Review of Surveillance Video of Scoville
           Residence Identifies Chavez Supplying Melkom With
           Drugs..........................................10

      D.   Search of Chavez's Phone Reveals Identity of
           BERMUDEZ Involved With Supplying Chavez With
           Methamphetamine................................11

      E.   Review of Cell-Site Information Reflects Chavez
           and BERMUDEZ Met Before February 11, 2020 in a
           Suspected Drug Transaction.....................13

      F.   Deputies Arrest BERMUDEZ with Methamphetamine in
           March 2020.....................................14

      G.   Additional Surveillance of BERMUDEZ............15

VI.   TRAINING AND EXPERIENCE ON DRUG OFFENSES............19

VII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES..........21

VIII.      CONCLUSION.....................................25

I, Christopher Siliciano, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against ANDRES BERMUDEZ, also known as "Tito" ("BERMUDEZ"), for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii):  Possession with Intent to Distribute a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search the following:

a.    1850 Bradcliff Way, Palmdale, California 93551 (the "**Subject Premises**"), as described more fully in Attachment A-1;

b.    A Honda Civic, California license plate number 7UVU643, registered to Moises A. Castro ("**Subject Vehicle 1**"), as described more fully in Attachment A-2;

c.    A motorhome, California license plate number 4PTY764, registered to Kristina Baca ("**Subject Vehicle 2**" and, collectively with **Subject Vehicle 1**, the "**Subject Vehicles**"), as described more fully in Attachment A-3; and

d.    The person of BERMUDEZ, as further described in Attachment A-4.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Manufacturing, Distribution of, and Possession with Intent to Distribute, a Controlled Substance), 846 (Attempt and Conspiracy to Commit Controlled Substance

Offense), and 843(b) (Unlawful Use of a Communication Facility, Including the Mails, to Facilitate the Distribution of a Controlled Substance) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since October 2017.  As a requirement for employment as an FBI Special Agent, I successfully completed the New Agent Basic Field Training Course located at the FBI Training Academy in Quantico, Virginia.  As a function of my assignment, I have received both formal and informal training from the FBI and other institutions regarding computer technology, financial investigations, cryptocurrency, and drug trafficking organizations.

6.    As a Special Agent with FBI, part of my duties includes the investigation of criminal violations as proscribed by 21 U.S.C § 841 and 21 U.S.C § 846. Moreover, as an FBI

Special Agent, I am a Federal Law Enforcement Officer, authorized to investigate violations of the laws of the United States and to execute search and seizure warrants issued under the authority of the United States.

7.    I have conducted and participated in criminal investigations for violations of federal and state laws including, but not limited to, narcotics trafficking, computer-based financial crimes, money laundering, firearms, fraud, and other organized criminal activity.  I have prepared, executed, and assisted in numerous search and arrest warrants.  I have also conducted and participated in criminal and administrative interviews of witnesses and suspects.  I am familiar with the formal methods of illegal narcotics investigations, including, but not limited to, electronic surveillance, visual surveillance, general questioning of witnesses, search warrants, confidential informants, the use of undercover agents, and analysis of financial records.  I have participated in investigations of organizations involved in the manufacture, distribution, and possession with intent to distribute controlled substances, including those involving the dark web and virtual currency.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    Since February 2019, the FBI, Homeland Security Investigations ("HSI"), and United States Postal Inspection Service ("USPIS") have been investigating a drug trafficking organization (the "STEALTHGOD DTO") selling narcotics, including methamphetamine and 3, 4-Methylenedioxymethamphetamine ("MDMA")

on darknet marketplaces suspected of operating the monikers "Hectorsmom", "Stealthgod", and others.  In February 2020, law enforcement arrested five individuals in connection with this DTO and after searching two residences used in furtherance of the criminal scheme, seized approximately 120 pounds of methamphetamine, 30,000 pills of suspected MDMA, and five firearms.  Based on further investigation from that search, agents have identified BERMUDEZ as one of the sources of supply of methamphetamine to the STEALTHGOD DTO.  BERMUDEZ has resided at the **Subject Premises** and has been observed driving the **Subject Vehicles**.  Based on the training and experience of investigators, evidence of drug trafficking is expected to be recovered from the **Subject Premises** and the **Subject Vehicles**.

### IV.   BACKGROUND ON DARKNET DRUG TRAFFICKING

9.   Based on my training and experience, I am aware of the following concepts:

a.   The "dark web," also sometimes called the "dark net" or "deep web," is a colloquial name for a number of extensive, sophisticated, and widely used criminal marketplaces operating on the Internet, which allow participants to buy and sell illegal items, such as drugs, firearms, and other hazardous materials with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply "web").  These online black market websites use a variety of technologies, including the Tor network (defined below) and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring.  A

famous dark web marketplace, Wall Street Market, operated similar to legitimate commercial websites such as Amazon and eBay, but offered illicit goods and services.  Law enforcement shut down Wall Street Market in 2019.

b.    "Vendors" are the dark web's sellers of goods and services, often of an illicit nature, and they do so through the creation and operation of "vendor accounts."

c.    The "Tor network," or simply "Tor," is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users. Tor likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the Tor network.  Such "hidden services" operating on Tor have complex web addresses, generated by a computer algorithm, ending in ".onion" and can only be accessed through specific web browser software, including a major dark-web browser known as "Tor Browser," designed to access the Tor network.  One of the logos, or "icons," for Tor Browser is a simple image of the Earth with purple water and bright green landmasses with bright green concentric circles wrapping around the planet to look like an onion.

d.    Darknet marketplaces often only accept payment through virtual currencies, such as Bitcoin, and operate an escrow whereby customers provide the digital currency to the

marketplace, who in turn provides it to the vendor after a transaction is completed.  Accordingly, large amounts of Bitcoin sales or purchases by an individual can be an indicator that the individual is involved in drug trafficking or the distribution of other illegal items.  Individuals intending to purchase illegal items on Wall Street Market-like websites need to purchase or barter for Bitcoins.

       e.    When vendors receive orders for narcotics on the darknet, the orders can come from anywhere in the world; vendors are known to use U.S. mail and/or commercial carriers to distribute narcotics.

       f.    Vendors operate akin to traditional drug trafficking organizations, with sources of supply (who provide drugs to them) and couriers (who drop off mail packages to customers).

## V.  <u>STATEMENT OF PROBABLE CAUSE</u>

10.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.  Background of Investigation

11.  Since February 2019, federal law enforcement agents have been investigating a group of darknet drug vendors believed to be operated by the same group, including "HectorsMom" and "Stealthgod," which collectively made over 18,000 sales on the darknet.  These vendor monikers sold drugs on a variety of darknet marketplaces (some of which are now defunct), such as Wall Street Market, Empire, and Nightmare, and through encrypted

7

communications platforms such as ProtonMail.  Over the course of
the investigation, these vendors sold methamphetamine for
approximately $400 per ounce.  Agents believed that these
monikers were affiliated with each other based on the
advertisements and comments on darknet forums.  Agents conducted
undercover purchases of drugs, including methamphetamine, from
some of these vendor monikers.  These vendors sent drugs hidden
in items such as puzzle boxes and health and wellness products.

     **B.**   **February 11, 2020, Drug Seizures**

     12.  In connection with this investigation, on February 10,
2020, the Honorable Jacqueline Chooljian, United States
Magistrate Judge, authorized search warrants for two locations
in the Central District of California associated with the
STEALTHGOD DTO, specifically the residence of Rane Melkom and
Teresa McGrath (the "Scoville Residence") and a residence
occupied by Mark Chavez, Thomas Olayvar, and Matthew Ick ("the
"Stoa Residence").  Law enforcement officers executed the
warrants on February 11, 2020.

     13.  During the search of the Scoville Residence, Melkom
and McGrath were present;[1] law enforcement officers found the
following in a shed adjoining the residence:

---

[1] Melkom and McGrath have been charged in a two-count
information for possession with intent to distribute
methamphetamine and MDMA, in violation of 21 U.S.C. §§
841(a)(1), (b)(1)(A)(viii), (b)(1)(C).  McGrath has pleaded
guilty to a superseding information charging her with conspiracy
to distribute and posses with intent to distribute
methamphetamine and MDMA, in violation of 21 U.S.C.
§§ 841(a)(1), (b)(1)(A)(viii), (b)(1)(C), conspiracy to launder
monetary instruments, in violation of 18 U.S.C. § 1956(h), and

a.   22.183 kilograms of actual methamphetamine.

b.   Approximately 6,701 grams of MDMA.

c.   Two loaded Glock pistols, bearing serial numbers NRU539 and GMZ799.

d.   60 packaged and sealed USPS priority mail envelopes addressed to various addresses, in over 35 states across the country, that were later discovered to contain drugs, including a crystalline like substance that yielded a presumptive positive for the presence of methamphetamine, orange triangle and square shaped pills that yielded a presumptive positive for the presence of MDMA, Orange circle shaped pills marked "AD30" that yielded a presumptive positive for the presence of methamphetamine, a brown tar-like substance suspected to be hashish, and white rectangular pills suspected to be Alprazolam.

14.   In addition, in the residence portion of the Scoville Residence, law enforcement officers seized a loaded FNH pistol, bearing serial number GKU0127246, under the bed of Melkom and McGrath.

15.   During the search of the Stoa Residence, Chavez, Olayvar, Ick, and others were present;[2] law enforcement officers found the following:

---

possession of firearms in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c).  See United States v. Melkom and McGrath, 20-CR-00136-AB.

[2] Chavez has pleaded guilty to an information charging him with conspiracy to possess with intent to distribute and distribute methamphetamine and MDMA, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), (b)(1)(C) and possession of

a.    Approximately 16.62 kilograms (36.64 pounds) of methamphetamine; and

b.    Two loaded handguns.

**C.    Review of Surveillance Video of Scoville Residence Identifies Chavez Supplying Melkom With Drugs**

16.    During the search of Melkom's residence described above, agents identified a surveillance camera installed over the entry of the shed at the Scoville Residence, where the drugs were discovered.

17.    On August 5, 2020, the Honorable Pedro V. Castillo, United States Magistrate Judge, Central District of California, authorized a warrant for the production and search of information -- including video recordings -- associated with the camera held with the provider of that surveillance camera.

18.    During my review of video recordings obtained pursuant to the warrant, I observed a video from February 9, 2020, showing Melkom and Chavez carrying black duffel bags from a car into the portion of Melkom's residence where the drugs were discovered.  Based on my training, experience, and investigation in this case, I believe that Chavez delivered methamphetamine to Melkom for further distribution via the dark web.

---

firearms in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c).  See United States v. Chavez, 20-CR-00130-AB. Olayvar and Ick are currently charged in an information with possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii).  See United States v. Olayvar and Ick, 20-CR-00135-AB.

**D.     Search of Chavez's Phone Reveals Identity of BERMUDEZ Involved With Supplying Chavez With Methamphetamine**

19.    Agents lawfully searched Chavez's cellular telephone that was seized from the Stoa Residence, which was an iPhone with phone number ending in 8606 (the "Chavez phone").  During a search of the Chavez phone, I found messages whereby Chavez used coded language to discuss purchasing bulk amounts of drugs from several individuals.  Relevant here, I found several messages between the Chavez phone and a phone number ending in 8004 (the "BERMUDEZ phone"), to include the following:

a.    On January 18, 2020, the BERMUDEZ phone sent a message to Chavez stating: "Hey mark there 50 real good right here at my boys house this is one of my good boys his well connect I've been talking him about having 50 to 100 sitting there just for u so he has them let me know".

i.    Based on my background, training, experience, and investigation in this case, I believe that Chavez and the BERMUDEZ phone were discussing methamphetamine transactions in terms of pounds of product, such that "50 to 100" means 50 to 100 pounds of methamphetamine.

b.    On February 7, 2020, the BERMUDEZ phone sent a message to Chavez stating: "Hey mark  How are you Everything good  I was  Calling you to let you know  I could get you some real good ones nice and chunky for a good price as many as need 30lb + for $975."

i.    Based on my training and experience, I know drug traffickers describe quality methamphetamine using terms

like "chunky".  Based on my background, training, experience, and investigation in this case, I believe that Chavez and the BERMUDEZ phone were again discussing methamphetamine transactions.

       c.  Between February 9 and 10, 2020, Chavez and the BERMUDEZ phone exchanged the following messages:

| | |
|---|---|
| Chavez: | Hay buddy I need another 30 |
| BERMUDEZ phone: | Okay Let me see |
| Chavez: | Can you try to get at 950 brother |
| BERMUDEZ phone: | Yo what's good mark , my boy just called me he said there's gonna be 200 of them around 4:30-5:00pm let me know how many u want so he could put them to side |
| Chavez: | Yes I'll be ready at 8 |

       i.  Based on my background, training, experience, and investigation in this case, I believe that Chavez and the user of the BERMUDEZ phone were negotiating the sale of 30 pounds of methamphetamine ("another 30") for $950 per pound ("Can you try to get at 950 brother").

       d.  During a search of the Chavez phone, I also found messages to and from Melkom discussing the acquisition, and delivery to Melkom's residence, of large quantities of methamphetamine.[3]  Relevant here, on February 10, 2020, at 11:03 p.m., Chavez sent a message to Melkom stating, "Okay I got another 40."

---

[3] Agents have also lawfully searched Melkom's phone that was seized in connection with the above-referenced search warrants and have identified the corresponding messages in that phone.

i.   Based on my background, training, experience, and investigation in this case, I believe that Chavez messaged Melkom to tell Melkom he had obtained an additional 40 pounds of methamphetamine ("I got another 40").  I further believe, based on the context of this message, that this was the approximately 40 pounds that investigators seized from the Stoa residence on February 11, 2020.

**E.   Review of Cell-Site Information Reflects Chavez and BERMUDEZ Met Before February 11, 2020 in a Suspected Drug Transaction**

20.   On January 30, 2020, the Honorable Alexander F. MacKinnon, United States Magistrate Judge, authorized a continued warrant for the disclosure of prospective cell-site and GPS information for the Chavez phone.  On March 10, 2020, the Honorable John E. McDermott, United States Magistrate Judge, authorized a warrant for the disclosure of historical cell-site information and prospective cell-site and GPS information for the BERMUDEZ phone.

21.   Based on my review of the cell-site and GPS information obtained pursuant to the warrants, I am aware that the Chavez phone and the BERMUDEZ phone were both located in the vicinity of east Los Angeles around the same time -- between 10:00 and 10:30 p.m. -- on the evening of February 10, 2020. Information for the location of the Chavez phone reflects that Chavez did not regularly spend time in that area.

22.   Based on my review of messages on the Chavez phone, the cell-site information, the surveillance video, and my investigation in this case, I believe that on February 10, 2020,

the user of the BERMUDEZ phone provided Chavez with the approximately 40 pounds of methamphetamine seized from Chavez's residence on February 11, 2020.  I further believe that Chavez obtained the drugs in connection with Melkom for sale on the dark web.

**F.   Deputies Arrest BERMUDEZ with Methamphetamine in March 2020**

23.   On March 28, 2020, unrelated to the investigation described above, Los Angeles County Sheriff's Department ("LASD") deputies conducted a traffic stop of **Subject Vehicle 1** for a moving violation on Soledad Canyon Road in Canyon Country, California.  Based on my review of that report, I am aware of the following:

a.   During the stop, deputies identified the driver as BERMUDEZ.  Deputies saw drug paraphernalia in plain view and inquired whether there was anything else illegal in the vehicle, to which BERMUDEZ responded he had methamphetamine inside. Deputies conducted a search of the vehicle and found suspected methamphetamine in a Ziploc bag stuffed between the driver's seat and center console.  Deputies also recovered a plastic baggie containing a black, tar-like substance resembling heroin in the center console.

b.   After the deputies advised BERMUDEZ of his Miranda rights, which he appeared to understand and agreed to waive, BERMUDEZ stated the drugs belonged to him but denied selling drugs.

c.   The deputies arrested BERMUDEZ on charges of possession of a controlled substance (methamphetamine) for sale, possession of heroin, and possession of drug paraphernalia.  He was booked at the Los Angeles Sheriff's Santa Clarita Station, and subsequently released from custody.

d.   At the time of his arrest, BERMUDEZ provided officers with his address (the **Subject Premises**) and phone number (the BERMUDEZ phone).

24.  Forensic chemists at the DEA Southwest Laboratory later confirmed the suspected methamphetamine to be 58 grams of methamphetamine hydrochloride.

25.  A review of the cell-site and GPS information for the BERMUDEZ phone at the time of the traffic stop and subsequent arrest, places the BERMUDEZ phone in the vicinity of Soledad Canyon Road, and, later, the Los Angeles County Sheriff's Department Santa Clarita Station.  Based on this information, I believe that BERMUDEZ is the user of the BERMUDEZ phone.

**G.   Additional Surveillance of BERMUDEZ**

26.  As discussed above, at the time of his arrest, BERMUDEZ provided officers with his address (the **Subject Premises**) and phone number (the BERMUDEZ phone).

27.  On April 14, 2020, an LASD detective conducted surveillance at 42524 3rd Street, East Lancaster, California, based on location information received from the BERMUDEZ phone. **Subject Vehicle 2** was observed parked on the west shoulder of 3rd Street east across from 42534 3rd St. East.

15

28.   On April 21, 2020, an LASD detective received a
location "ping" for the BERMUDEZ phone to a location near 3rd
Street East and Avenue L-4 in Lancaster, California.  The LASD
Detective observed **Subject Vehicle 1** and **Subject Vehicle 2**
parked next to each other in the location of the phone ping.
**Subject Vehicle 2** had interior lights illuminating the rear
portion of the motorhome.

29.   On April 28, 2020, an LASD detective reviewing cell-
site and GPS information for the BERMUDEZ phone tracked the
phone's location to the vicinity of the **Subject Premises.**  Later
that day, the detective conducted surveillance of the **Subject
Premises** and saw **Subject Vehicle 1** parked in front of the
residence.

30.   On April 29, 2020, at the request of the LASD
detective, an LASD deputy stopped **Subject Vehicle 1** in Palmdale,
California, for a tinted windows violation.  The deputy
identified BERMUDEZ as the sole occupant of the vehicle and
observed that he was exhibiting signs and symptoms of recent
drug use.  After BERMUDEZ told the deputy that he had recently
used narcotics, the deputy detained BERMUDEZ in the back seat of
the patrol car pending a narcotics investigation.  During the
course of the investigation, the LASD detective (who has
assisted with this investigation, as described above) arrived
and confirmed BERMUDEZ was the driver of **Subject Vehicle 1**.  The
detective also called the BERMUDEZ phone while the detective was
at the location.  The deputy saw the phone in BERMUDEZ's
possession light up, and heard it ring, when the detective

16

called.  The deputy provided BERMUDEZ with a warning and released him.

31.  The detective later reviewed cell-site and GPS information for the BERMUDEZ phone around the time of the traffic stop and saw that the phone appeared at the location of the traffic stop during that time.  Following the stop, cell-site and GPS information for the BERMUDEZ phone show that BERMUDEZ went directly to the vicinity of the **Subject Premises.**

32.  On May 1, 2020, the detective conducted surveillance of the **Subject Premises**.  At 5:50 a.m., the detective saw **Subject Vehicle 1** parked in front of the residence.  At 5:00 p.m., the detective saw BERMUDEZ sitting in a chair on the front porch of the **Subject Premises**.

33.  Based on my review of cell-site and GPS information for the BERMUDEZ phone, I am aware that the BERMUDEZ phone -- and, thus, BERMUDEZ -- is regularly in the vicinity of the **Subject Premises.**  When he is not at the **Subject Premises**, BERMUDEZ commonly drives to Santa Clarita, San Fernando, North Hollywood, Van Nuys, or Sunland.  Cell-site and GPS information show that BERMUDEZ stops at various stores and gas stations while in those areas.  Based on my knowledge of this investigation, I believe that BERMUDEZ transports controlled substances from the **Subject Premises** to those areas for the purpose of sales.

34.  On September 9, 2020, the Honorable Patricia Donahue, United States Magistrate Judge, authorized a renewed warrant for the disclosure of historical cell-site information and

17

prospective cell-site and GPS information for the BERMUDEZ
phone.  Based on a review of this historical cell-site
information, I learned the following:

a.    On July 28, 2020, the BERMUDEZ phone made
multiple outgoing phone calls.  The first tower to receive a
signal from the BERMUDEZ phone during these calls placed the
address of this phone call nearby 38650 5th Street West,
Palmdale, California 93551, in the general vicinity of the
**Subject Premises.**

b.    The BERMUDEZ phone has made multiple outgoing
calls in Sherman Oaks, California, as recently as September 1,
2020.

35.    On September 17, 2020, I observed the **Subject Vehicles**
parked together in the vicinity of 5225 Sepulveda Blvd., Sherman
Oaks, California 91411.  The vehicles were attached, and
appeared to have been parked in that location consistently.
Based on the location of the vehicles, I believe that BERMUDEZ
is spending consistent time living in **Subject Vehicle 2.**

*Photo from September 16, 2020:*



## VI. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

36.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs, including for historical transactions.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences and vehicles.  These records are also maintained after a sale has occurred.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion

19

of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

       d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

       e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

       f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

       g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus

may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

i.   When drug traffickers deal with significant quantities of drugs, such as methamphetamine, they may also possess firearms for protection of those drugs.  That appeared to be the case with respect to the STEALTHGOD DTO, given that both residences where significant quantities of methamphetamine was found also had guns found in the proximity of the drugs.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[4]

37.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

38.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

39.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BERMUDEZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of BERMUDEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

40.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.      <u>CONCLUSION</u>

41.  For all of the reasons described above, there is probable cause to believe that BERMUDEZ has committed a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the **Subject Premises,** the **Subject Vehicles**, and the person of BERMUDEZ as further described above and in the various Attachments A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _18th_ day of
_September_ , 2020.

_____
UNITE  STATES MAGISTRATE JUDGE

Hon. Michael R. Wilner